

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**FILED**
U. S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUN 2 8 2021

**JAMES W. McCORMACK, CLERK**
By:_____
                    DEP CLERK

WILLIAM PORTER, Individually, and
MARANDA STIVERS, Individually,
and as Next Friend to
GATLIN OUTLAW, a Minor,

        Plaintiffs,

        v.

CITY OF LITTLE ROCK, a Municipality,
KENTON BUCKNER, Individually and
in his Official Capacity,
TIMOTHY CALHOUN, Individually,
JOHN DOE #1, Individually, and
JOHN DOE #2, Individually,

        Defendants.

Case No.: 4:21-cv-574-JM

*****JURY TRIAL DEMANDED**

This case assigned to District Judge Moody
and to Magistrate Judge Volpe

## COMPLAINT

NOW COME, Plaintiffs, WILLIAM PORTER and MARANDA STIVERS, Individually,
and as Next Friend of GATLIN OUTLAW, a Minor (hereafter collectively "PLAINTIFFS"), by
and through their attorneys, LAUX LAW GROUP and BEN CRUMP, PLLC, and for their cause
of action, state as follows:

### INTRODUCTION

The Fourth Amendment to the United States Constitution reads:

> The right of the people to be secure in their persons, houses, papers,
> and effects, against unreasonable searches and seizures, shall not be
> violated, and no Warrants shall issue, but upon probable cause,
> supported by Oath or affirmation, and particularly describing the
> place to be searched, and the persons or things to be seized.

<u>JURISDICTION AND VENUE</u>

1.      This action arises under the United States Constitution, particularly under the Fourth and Fourteenth Amendments, and under law, particularly the Civil Rights Act of 1871, 42 U.S.C. § 1983 and Arkansas state law.  This Honorable Court has jurisdiction by virtue of 28 U.S.C. §§ 1331 and 1367.  Venue is founded in this Court upon 28 U.S.C. § 1391 as the acts of which Plaintiffs complain arose in this District.

<u>PARTIES</u>

2.      At all relevant times, WILLIAM PORTER (hereafter "PORTER") was a citizen of the United States of America and was, therefore, entitled to all legal and constitutional rights afforded citizens of the United States of America.  At all relevant times, PORTER resided in Pulaski County, Arkansas.  At all relevant times, including June 27, 2021, PORTER lived at 601 Valmar Street, Little Rock, Arkansas.

3.      At all relevant times, MARANDA STIVERS (hereafter "STIVERS") was a citizen of the United States of America and was, therefore, entitled to all legal and constitutional rights afforded citizens of the United States of America.  At all relevant times, including June 27, 2021, STIVER was temporarily staying at PORTER's home, located at 601 Valmar Street, Little Rock, AR 72205, with her minor son, GATLIN OUTLAW (hereafter "GATLIN").

4.      At all relevant times, STIVERS was and is the legal and biological parent of GATLIN.  At the time of the June 27, 2018 LRPD "no-knock" raid which forms the basis for PLAINTIFFS' complaint, GATLIN was five years old.

5.      At all relevant times, the CITY OF LITTLE ROCK (hereafter "CITY") was a municipality organized and existing under the laws of the State of Arkansas.  At all relevant times, the CITY was located in the County of Pulaski, State of Arkansas, and was the employer of the

individually named defendants.  At all relevant times, the CITY is and was empowered, funded and directed to pay any § 1983 civil rights or intentional tort judgment for compensatory damages, actual damages and attorney fees, if applicable, for which any CITY employee acting within the scope of his or her employment is found liable.

6.      Accordingly, the CITY is an indemnification party regarding the acts and/or omissions of which PLAINTIFFS complain.  As reflected in the matter of *Ellison v. Lesher, et al.*, 4:11-CV-752 BSM, the CITY has the authority to provide for the indemnification of CITY police officers accused of civil rights violations and intentional torts committed within the scope of their employment, and its common practice was to authorize indemnification for such officers.

7.      At all relevant times, the CITY participated in the Municipal Legal Defense Program which is offered by the Arkansas Municipal League to Arkansas towns and cities.  The acts and omissions of which PLAINTIFFS complain constitute a civil rights lawsuit against the CITY and the individually named defendants.  The Arkansas Municipal Legal is a primary or secondary indemnification party regarding the acts and omissions of CITY and the individually named defendants of which PLAINTIFFS herein complain.

8.      At all relevant times, including June 27, 2018, and for several years prior thereto, the CITY delegated its policy-making authority to its chiefs of police, including Defendant, KENTON BUCKNER (hereafter "BUCKNER"), and his predecessors, including Stuart Thomas.

9.      At all relevant times, BUCKNER, was employed by the CITY, and acted under the color of state law, within the scope of his employment.  At all relevant times, BUCKNER had the ultimate responsibility within the Little Rock Police Department (LRPD) for the protection of life, the upholding of the United States Constitution, the preservation of law and order, the investigation of all crimes and the enforcement of the laws of the State of Arkansas.

3

10.     At all relevant times, the CITY delegated to BUCKNER final policy-making authority to create, adopt and implement police policies within the LRPD whether formal or informal.  At all relevant times, BUCKNER was responsible for assuring the enforcement of LRPD General Orders, Rules & Regulations and Divisional Operational Procedures (collectively "policy" or "policies") among LRPD officers.  As Chief of Police of LRPD, and pursuant to the authority vested in him, BUCKNER was empowered to initiate procedural changes to address or remedy any unconstitutional trend or pattern that he identified during his tenure as chief.

11.     At all relevant times, BUCKNER had the final authority in terms of promulgating policies for enactment at the LRPD–whether those policies were formal or informal–via memoranda to his LRPD subordinates, down the chain of command.

12.     At all relevant times, TIMOTHY CALHOUN (hereafter "CALHOUN"), was employed by the CITY, and acted under the color of state law, within the scope of his employment.  At all relevant times, CALHOUN, a lieutenant with the LRPD, was the SWAT Unit Commander, and thus responsible for coordinating, deploying and supervising the SWAT team members, as well as accurate event reporting and overseeing SWAT team members' training and discipline.

13.     At all relevant times, Defendants, JOHN DOE 1 and JOHN DOE 2 (collectively "JOHN DOES 1-2"), and each of them, were employed by the CITY as LRPD police officers, working in the LRPD Narcotics Unit and acting under the color of state law, within the scope of their employment.

14.     Though JOHN DOES 1-2 are currently unidentified, PLAINTIFFS allege that each of them engaged in various unconstitutional acts and omissions which proximately caused PLAINTIFFS' damages.  Upon information and belief, PLAINTIFFS state that the true identities of JOHN DOES 1-2 will be ascertained during court-ordered discovery in the matter or sooner.

BACKGROUND FACTS

15.     At all relevant times, the LRPD had a Narcotics Unit which was responsible for the investigation of criminal offenses related to the trafficking of controlled substances.  At all relevant times, including June 2018, JOHN DOES 1-2 were members of the Narcotics Unit.  The Narcotics Unit is responsible for the investigation of criminal offenses related to the trafficking of controlled substances.  According to the CITY, during 2016, the Narcotics Unit arrested 982 individuals and charged them with 1,965 felonies and 1,317 misdemeanor crimes.  The Narcotics Unit sometimes enlists the assistance of confidential informants ("C.I.s") to provide information on potential drug traffickers and to participate in drug stings in the role of drug purchaser for which the C.I.s are monetarily or otherwise compensated.

16.     The SWAT Unit is staffed by a Lieutenant (Unit Commander), two (2) sergeants (Team Leaders) and twenty-five (25) officers.  At all relevant times, the LRPD had a SWAT policy which reflects that the SWAT Unit's "primary mission" is "to provide support to the Department during operations that require special training and equipment to resolve high-risk situations."  The LRPD's SWAT policy states that "[e]ach tactical situation is unique and may require different responses."  According to the CITY, in 2016, the SWAT Unit responded to seven (7) SWAT call-outs and executed eighty-nine (89) high-risk search warrants.

17.     The SWAT Unit is outfitted with an array of weaponry, including a carbine assault rifle, which is comparable to an AR-15.  The assault rifle of choice most often at the LRPD is the .223 caliber Bushmaster with EOTech holographic laser scope or Bushmaster M4-Type Carbine.  A .223 caliber Bushmaster carbine assault rifle and ammunition are depicted in Photographs 1-2 (below) respectively:

 

**Photograph 1**                                                    **Photograph 2**

18.     Both the LRPD SWAT Unit and Narcotics Unit are under the direct command of the Special Investigations Division Commander who reports directly to the LRPD chief of police. From June 2014 until late 2018 the chief of police was BUCKNER.

19.     A "no-knock" warrant is defined as a search warrant that authorizes police officers to enter certain premises without first knocking and announcing their presence or purpose prior to entering the premises.  In order to obtain a "no-knock" warrant, a police officer must submit an affidavit to a judge or magistrate whom, upon receiving and reviewing said affidavit, will decide whether to authorize an exception to the "knock and announce" rule based on the facts presented in the affidavit.

20.     At all relevant times, BUCKNER, JOHN DOES 1-2 and CALHOUN, and each of them, were trained in the Fourth Amendment and proper search and seizure law and were further that aware that affidavits submitted to judges or magistrates by officers seeking to obtain "no-knock" warrants must be premised on a good faith determination that probable cause exists and must not be premised on falsehoods.

21.     At all relevant times, BUCKNER, JOHN DOES 1-2 and CALHOUN, and each of them, knew that the Fourth Amendment's requirement that a specific place be described when

applied to dwellings refers to a single-family unit (the residence of one person or family) and that a specific individual must be named or identified as the subject of the warrant.

22.     At all relevant times, BUCKNER, JOHN DOES 1-2 and CALHOUN, and each of them, knew that "no-knock" warrants were reserved for "high-risk situations," and that it is unconstitutional and unlawful to knowingly submit affidavits which contain material misrepresentations of fact or are otherwise untruthful to judges or magistrates.  At all relevant times, BUCKNER, JOHN DOES 1-2 and CALHOUN, and each of them, were aware of the inherently dangerous nature of SWAT entries.

23.     Prior to April 2014, the CITY and BUCKNER knew that JOHN DOES 1-2 and other CITY employees made material misrepresentations and omissions to judges in order to gain "no-knock" entry into homes despite the fact that the owners and residents of those homes did not meet the required criteria and did not constitute a "high risk situations."

24.     Moreover, the CITY and BUCKNER knew that the JOHN DOES 1-2 and other CITY employees often presented affidavits for "no-knock" warrants to judges in which material misrepresentations and untruths were contained.

25.     Furthermore, at all relevant times, the CITY and BUCKNER knew that the JOHN DOES 1-2, and each of them, had a practice of utilizing C.I.s that were known to be unreliable, to provide false information and to have prior convictions for crimes involving false statements and deception.  They knew that JOHN DOES 1-2's failure to adhere to constitutional requirements of the Fourth Amendment would result in C.I.s becoming motivated to lie for monetary reasons or otherwise exploit the system for personal benefit.

26.     Despite this knowledge, in or around April 2014, and for many years prior thereto, there existed an unconstitutional official policy at the LRPD (hereafter "mandatory SWAT

policy") whereby SWAT Unit involvement was required for every search warrant executed by the LRPD, regardless of the fact that the constitutional threshold for this type of entry was often not satisfied in the circumstances presented to the JOHN DOES 1-2.

27.    An excerpt from an April 7, 2014 LRPD Memorandum from an LRPD sergeant reads as follows:

> "The reason SWAT was used is because many times guns and violence are associated with narcotics. *It is a mandate from the Office of the Chief of Police that the SWAT team execute all search warrants.*" (emphasis added).

28.    A "policy," as defined by the Eighth Circuit Court of Appeals in *Mettler v. Whitledge*, 165 F.3d 1197 (1999), is "an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters."

29.    A *Monell* "custom" is defined as a practice of municipal officials that is not authorized by written law, but which is so permanent and well-settled as to have the force of law.

30.    Pleading alternately, at all relevant times, including prior to April 2014, there existed an unconstitutional *Monell* municipal "custom" at the LRPD whereby LRPD chiefs of police, including BUCKNER, knowingly authorized the use of the SWAT Unit for every search warrant executed by the LRPD or in situations not reasonably characterized as "high risk" despite the fact that such a custom constitutes a continuing violation the Fourth Amendment.

31.    At all relevant times, BUCKNER, JOHN DOES 1-2 and CALHOUN, and each of them, knew or should have known that the mandatory SWAT policy did not comport with the liberty protections established and enshrined in the United States Constitution, particularly, the Fourth and Fourteenth Amendments.

32.    At all relevant times, including during various IAD investigations resulting from the "no-knock" narcotics raids, BUCKNER, JOHN DOES 1-2 and CALHOUN, and each of them,

knew that the "no-knock" narcotics raids executed by SWAT, CALHOUN and JOHN DOES 1-2 were in violation of LRPD policy and the United States Constitution.

33.    Despite this knowledge and despite the inherently dangerous nature of the "no-knock" narcotics raids conducted by JOHN DOES 1-2 and CALHOUN, BUCKNER continued to promulgate an unconstitutional official policy and/or authorize, support and maintain a *Monell* "custom" which was unconstitutional and posed an unreasonable threat of harm to the persons and property of Little Rock citizens.

THE UNCONSTITUTIONAL JUNE 27, 2018 "NO-KNOCK" RAID
OF PORTER'S HOME AUTHORIZED BY BUCKNER AND
CONDUCTED BY SWAT, JOHN DOES 1-2 AND CALHOUN

34.    At all relevant times, including June 27, 2018, PORTER resided at 601 Valmar Street, Little Rock, Arkansas 72205 (hereafter "601 Valmar Street").

35.    In the spring or early summer of 2018, JOHN DOES 1-2 staged a phony heroin purchase and claimed that it occurred at 601 Valmar Street in order to obtain a search warrant for the resident located at 601 Valmar Street.

36.    JOHN DOES 1-2 gave a confidential informant (C.I) with a known history of untruthfulness $100.00 for a staged heroin purchase.

37.    JOHN DOES 1-2 and the C.I. conducted the staged heroin purchase in such a way that allowed for the C.I. to keep the $100.00 in exchange for providing false incriminating information they could submit to a judge in an affidavit in order to obtain a search warrant to enter 601 Valmar Street.

38.    During this phony heroin purchase, one of two things happened: either JOHN DOES 1-2 never received any heroin from the C.I. and thus there was never any "purchased"

heroin provided to JOHN DOES 1-2 by the C.I.; or the C.I. gave JOHN DOES 1-2 heroin from a source other than PORTER, STIVERS or GATLIN.

39.     Either way, JOHN DOES 1-2 failed to collect and preserve any heroin related to the pre-June 27, 2018 alleged heroin purchase made by the C.I. at 601 Valmar Street.

40.     JOHN DOES 1-2 drafted an affidavit containing false information and submitted it to a Pulaski County Circuit Court judge in order to obtain a search warrant for 601 Valmar Street.

41.     On June 27, 2018, STIVERS and STIVERS' five-year-old son, GATLIN, were guests of PORTER's, visiting him at his residence at 601 Valmar Street.

42.     In the early morning hours of June 27, 2018, PORTER and STIVERS were inside the premises of 601 Valmar Street when they heard extremely loud banging coming from the front door.  The extremely loud banging at the front door shocked them and caused them great concern because they realized that someone was trying to break into PORTER's home.

43.     Seconds later, after another violent physical blow to the front door and door frame, PORTER's front door flew open and a SWAT team member threw at least one (1) flash bang disorientation grenade into the living room area of PORTER's home.  When the flash bang disorientation grenade(s) detonated, it disoriented PORTER, STIVERS and GATLIN, as intended, and emitted noxious smoke throughout the ground floor of the home.

44.     Immediately thereafter, wearing their protective gas masks and combat helmets, approximately six (6) SWAT team members burst through the front door threshold, first screaming indiscriminate and confusing verbal orders and then physically assaulting PORTER and STIVERS.  PORTER and STIVERS were each chased, grabbed, shoved, thrown to the ground and handcuffed.  The SWAT team was followed into the residence by narcotics detectives, including JOHN DOES 1-2.

10

45.     JOHN DOES 1-2 screamed at STIVERS, disparaging her motherhood and threatened to have the State take parental custody of GATLIN away from STIVERS and place GATLIN in foster care.  JOHN DOES 1-2 made these threats to STIVERS in close proximity to GATLIN, whom had been hysterically crying ever since the SWAT team's violent entry into PORTER's home.

46.     As the SWAT team exhaustively searched and ransacked PORTER's home, one of the SWAT team members observed a safe and forced PORTER to give them the combination to the safe, which he did.  The SWAT team opened the safe but, as previously advised by PORTER, no evidence or contraband was found in the safe.

47.     Prior to the June 27, 2018 "no-knock" raid, neither JOHN DOES 1-2 nor CALHOUN was aware of any violent criminal history pertaining to PLAINTIFF.  Neither JOHN DOES 1-2 nor CALHOUN knew PORTER to possess a weapon and no one had any reason to believe that PORTER possessed a weapon.  Neither JOHN DOES 1-2 nor CALHOUN ever saw PORTER in possession of any weapon.

48.     In the process of their rampage through PORTER's home, JOHN DOES 1-2 and the SWAT team destroyed personal property and severely damaged the interior and exterior of the residence, as depicted in Photographs 3-8 below:



**Photograph 3**



**Photograph 4**



**Photograph 5**



**Photograph 6**



**Photograph 7**



**Photograph 8**

49.     No heroin was located in the residence of 601 Valmar Street during the June 27, 2018 "no-knock" raid conducted by JOHN DOES 1-2, CALHOUN and the LRPD SWAT team.

50.     No contraband of any kind was located in the residence of 601 Valmar Street during the June 27, 2018 "no-knock" raid conducted by JOHN DOES 1-2, CALHOUN and the LRPD SWAT team.

12

51.     Though no contraband was found at the residence of 601 Valmar Street, and though neither PORTER, STIVERS nor GATLIN were placed under arrest for any crime, JOHN DOES 1-2 nonetheless illegally seized—or stole—PLAINTIFF's iPhone and absconded with it.

52.     As JOHN DOES 1-2 left the residence, after finding absolutely nothing that they attested to the judge they would find, JOHN DOES 1-2 tossed the search warrant at PORTER and unceremoniously exited the residence and then drove away from the area, along with the SWAT team, as though nothing ever happened.

53.     Even though JOHN DOES 1-2 seized PLAINTIFF's iPhone and illegally absconded with it, as reflected in official investigation documents executed after the "no-knock" raid, they falsely claimed that they did not seize or store any contraband or evidence, which was a knowingly false statement.

54.     The reason JOHN DOES 1-2 falsely denied seizing any evidence at 601 Valmar Street is that they each knew, based on the circumstances—which included the failure to satisfy probable cause to arrest—that the seizure of PORTER's iPhone was unconstitutional and illegal.

55.     In the Street Narcotics Detail sheet, JOHN DOES 1-2 intentionally omitted the fact that they used flash bang devices.  The reason JOHN DOES 1-2 intentionally omitted using detonation devices during the "no-knock" raid of 601 Valmar Street is that they each knew, based on the circumstances—which included a lack of basis to conclude a weapon was within the residence and which included the fact that there was a minor child in the residence—that there was no justifiable basis for them to use detonation devices.

56.     Even though the SWAT team was used to violently breach PORTER's home at 601 Valmar Street, neither JOHN DOES 1-2 nor anyone filled out a SWAT detail form after the "no-knock" raid on the residence.  The reason no one filled out a SWAT detail form after the "no-

knock" raid is that JOHN DOES 1-2 and everyone else involved in the "no-knock" raid knew, based on the circumstances, that SWAT entry was not warranted and, thus, they did not want to draw attention to the unconstitutional nature of the "no-knock" raid.

57.     No criminal charges were filed relating to the June 27, 2018 "no-knock" raid of STIVERS' home.

58.     In June 2019, following a spate of prominent civil rights lawsuits filed against the CITY over the excessive use of "no-knock" warrants by LRPD narcotics detectives—and the resulting national media attention the lawsuits garnered—the CITY significantly modified its "no-knock" search warrant policy to include more stringent guidelines, greater supervisory oversight and heightened vetting of C.I.s.

**COUNT I**
**JOHN DOES 1-2 AND TIMOTHY CALHOUN**
**VIOLATION OF FOURTH AMENDMENT**

59.     PLAINTIFFS hereby incorporate and re-allege Paragraphs one (1) through fifty-eight (58) as and for Paragraph fifty-nine (59) of Count I.

60.     At all relevant times, police officers, such as JOHN DOES 1-2, had a duty to be truthful in affidavits seeking to obtain a search warrant to enter the dwelling of a Little Rock citizen and a duty not to omit from affidavits any material information.

61.     At all relevant times, police officers, such as JOHN DOES 1-2, had a duty to properly execute controlled drug purchases during sting operations so that they comply with the U.S. Constitution, particularly the Fourth Amendment, and also with LRPD policy and established police protocol.

62.     At all relevant times, police supervisors, such as CALHOUN, had a duty to refrain from authorizing violations of the U.S. Constitution, particularly the Fourth Amendment, and from authorizing violations of the laws of the State of Arkansas.

63.     Despite these constitutional requirements and duties:

a)  JOHN DOES 1-2 intentionally misrepresented the number of years employed as a police officer to obtain a "no-knock" warrant of 601 Valmar Street;

b)  JOHN DOES 1-2 intentionally mispresented her professional experience conducting "no-knock" narcotics raids to obtain a "no-knock" warrant of 601 Valmar Street;

c)  JOHN DOES 1-2 intentionally misrepresented the CI's experience to obtain a "no-knock" warrant of 601 Valmar Street;

d)  JOHN DOES 1-2 intentionally misrepresented the CI's success rate to obtain a "no-knock" warrant of 601 Valmar Street;

e)  JOHN DOES 1-2 intentionally misrepresented material aspects of the alleged drug purchase to obtain a "no-knock" warrant of 601 Valmar Street;

f)  JOHN DOES 1-2 falsely claimed to have observed material aspects of the alleged drug purchase to obtain a "no-knock" warrant of 601 Valmar Street;

g)  JOHN DOES 1-2 conspired with the C.I. and trafficked false information provided by the C.I. in order to obtain a "no-knock" warrant of 601 Valmar Street;

h)  JOHN DOES 1-2 knew the C.I. did not by drugs from anyone at 601 Valmar Street, but falsely represented that he did in order to obtain a "no-knock" warrant of 601 Valmar Street;

i)  JOHN DOES 1-2 knew the C.I. they used was unreliable but falsely represented that the C.I. was reliable in order to obtain a "no-knock" warrant of 601 Valmar Street;

j)  JOHN DOES 1-2 failed to search or properly search the C.I. they used; and

15

k) CALHOUN authorized, coordinated and supervised the no-knock raid on 601 Valmar Street despite clear notice that indicators justifying a SWAT entry were not present.

64.    By reason of the conduct of JOHN DOES 1-2 and CALHOUN, and each of them, PLAINTIFFS were deprived of rights, privileges and immunities secured to them by the Fourth and Fourteenth Amendments to the U.S. Constitution, and laws enacted thereunder.

65.    The acts committed by JOHN DOES 1-2 and CALHOUN, and each of them, were unnecessary, objectively unreasonable and excessive and were, therefore, in violation of PLAINTIFFS' Fourth and Fourteenth Amendment Rights. Therefore, JOHN DOES 1-2 and CALHOUN, and each of them, are liable to PLAINTIFFS in damages under 42 U.S.C. § 1983, including loss of liberty interest, punitive damages and attorney fees.

## COUNT II
## JOHN DOES 1-2 AND TIMOTHY CALHOUN
## VIOLATIONS OF THE FOURTH AMENDEMENT–UNLAWFUL ENTRY

66.    PLAINTIFFS hereby incorporate and re-allege Paragraphs one (1) through sixty-five (65) as and for Paragraph sixty-six (66) of Count II.

67.    The Fourth Amendment prohibits unreasonable searches and seizures. At all relevant times, police officers, including JOHN DOES 1-2 and CALHOUN, have a duty to report violations of the U.S. Constitution that they observe or of which they are otherwise aware.

68.    At all relevant times, the LRPD had a Limits of Authority policy which required that "Little Rock Police Department personnel who are engaged in criminal investigations or law enforcement actions shall make sure that all persons are afforded the rights and protection guaranteed by the Constitution of the United States."

69.    JOHN DOES 1-2 and CALHOUN, and each of them, engaged in unlawful, unconstitutional conduct by:

16

a) executing a search and seizure on the dwelling at 601 Valmar Street without a legitimate basis in law; and

b) executing a "no-knock" raid on the dwelling at 601 Valmar Street despite the lack of a "high risk" situation and other criteria.

70.     The September 5, 2017 "no-knock" raid conducted upon 601 Valmar Street by JOHN DOES 1-2 and CALHOUN, and each of them, were unnecessary and unreasonable and caused PLAINTIFF's injuries and damages.

71.     By reason of the conduct of JOHN DOES 1-2 and CALHOUN, and each of them, PLAINTIFFS were deprived of rights, privileges and immunities secured to them by the Fourth and Fourteenth Amendments to the United States Constitution, and laws enacted thereunder.

72.     The acts committed by JOHN DOES 1-2 and CALHOUN, and each of them, PLAINTIFFS were unnecessary, objectively unreasonable and excessive and were, therefore, in violation of their Fourth and Fourteenth Amendment Rights.  Therefore, JOHN DOES 1-2 and CALHOUN, and each of them, are liable to PLAINTIFFS in damages under 42 U.S.C. § 1983, including loss of liberty interest, punitive damages and attorney fees.

## COUNT III
### CITY OF LITTLE ROCK
### UNCONSTITUTIONAL OFFICIAL POLICY AND/OR
### UNCONSTITUTIONAL *MONELL* CUSTOM

73.     PLAINTIFFS hereby incorporate and re-allege Paragraphs one (1) through seventy-two (72) above as and for Paragraph seventy-three (73) of Count III.

74.     At all relevant times, over the course of many years, there existed an unconstitutional official policy and/or unconstitutional *Monell* custom at the LRPD whereby:

a) BUCKNER required that all LRPD search warrants be executed with the assistance of the SWAT Unit, including JOHN DOES 1-2, showing a deliberate indifference to the inherently dangerous nature of SWAT raids;

17

b) LRPD police officers, including JOHN DOES 1-2 intentionally misrepresented the number of years employed as a police officer;

c) LRPD police officers, including JOHN DOES 1-2, intentionally mispresented their professional experience conducting "no-knock" narcotics raids to obtain "no-knock" warrants;

d) LRPD police officers, including JOHN DOES 1-2, intentionally misrepresented C.I.s' experience to obtain "no-knock" warrants;

e) LRPD police officers, including JOHN DOES 1-2, intentionally misrepresented C.I.s' success rate to obtain "no-knock" warrants;

f) LRPD police officers, including JOHN DOES 1-2, intentionally misrepresented material aspects of alleged drug purchases to obtain "no-knock" warrants;

g) LRPD police officers, including JOHN DOES 1-2, falsely claimed to have observed material aspects of alleged drug purchases to obtain "no-knock" warrants;

h) LRPD police officers, including JOHN DOES 1-2, conspired with C.I.s and trafficked false information provided by C.I.s in order to obtain "no-knock" warrants;

i) a code of silence concealing police misconduct was tolerated and maintained to perpetuate the LRPD's unconstitutional practice of obtaining and executing "no-knock" warrants without a legal or justifiable basis; and

j) BUCKNER, JOHN DOES 1-2 and CALHOUN concealed, intentionally mispresented and withheld material information during internal investigations in order to continue perpetrating the mandatory SWAT policy, to continue to obtain "no-knock" warrants and to protect LRPD police officers from criminal or civil liability.

75.     The allowance of this pattern was the result of deliberate indifference to fact that

LRPD's official policies and/or customs were in violation of the Fourth Amendment and would

naturally result in the violation of the constitutional rights of Little Rock citizens, including PLAINTIFFS.

76.     The official policy and/or *Monell* "custom" described above was the moving force behind the violations of PLAINTIFFS' constitutional rights and proximately caused PLAINTIFFS' constitutional injuries.  The official policy and/or *Monell* "custom" described above also proximately caused a deprivation of the rights, privileges and immunities secured to PLAINTIFFS by the Fourth and Fourteenth Amendments to the U.S. Constitution, and laws enacted thereunder.

77.     As a result of the official policies and/or customs described above, PLAINTIFFS' Fourth Amendment rights were violated.  Therefore, the CITY is liable to PLAINTIFFS in damages under 42 U.S.C. § 1983, including, loss of liberty interest and attorney fees.

**COUNT IV**
**KENTON BUCKNER, JOHN DOES 1-2 AND TIMOTHY CALHOUN**
**CIVIL CONSPIRACY PER 42 U.S.C. § 1983**

78.     PLAINTIFFS hereby incorporate and re-allege Paragraphs one (1) through seventy-seven (77) above as and for Paragraph seventy-eight (78) of Count IV.

79.     It is accurate to state that there exists a history of allegations of racial intolerance and retaliation against BUCKNER in his role as chief of police generally.

80.     For instance, in *Davis, et al. v. Buckner, et al.*, Eastern District of Arkansas Case No. 4:18-CV-183-BSM, filed in March 2018, four veteran African American LRPD officers sued BUCKNER and the CITY, alleging a pattern of race-based bullying, racial discrimination and retaliation all of which was committed and/or orchestrated by BUCKNER.

81.     A major component of the allegations in *Davis et al.* was that BUCKNER often acted through a coterie of subordinate, high-ranking loyalists who aided him and also did much of

the dirty work for him.  For instance, one of the *Davis et al.* plaintiffs alleged that after he spoke out about racism within the LRPD, BUCKNER retaliated against him by targeting and trying to eliminate the OK Program, which is a mentor program designed to assist at-risk African American boys and headed by the *Davis et al.* plaintiff.

82.     In November 2018, BUCKNER resigned from LRPD and took the chief of police position at the Syracuse Police Department (SPD) in central New York.

83.     In March 2020, the parties settled *Davis, et al.*  Apparently, the institutional racism alleged and proven in *Davis et al.* was so acute that, in May 2020, Little Rock Mayor Frank Scott announced that his office would commission a third-party, independent investigation of the LRPD's patterns and practices, as well as allegations of institutional racism within the department.

84.     However, the allegations of racial discrimination and retaliation stemming from his time as chief of police of LRPD were not an isolated matter for BUCKNER.  Accusations that he bears racial intolerance toward black officers have apparently followed him to SPD.

85.     In June 2021, SPD Officer Brandon Hanks, an at-risk youth advocate who made national news for his one-on-one basketball games and donations to kids in Syracuse, filed a lawsuit against the City of Syracuse and BUCKNER, alleging racial discrimination and retaliation.

86.     The gravamen of Officer Hanks' complaint is that he was denied a position on the Gang Violence Unit, despite recommendations of his lieutenant supervisor who felt that Hanks' "high level of performance" among other things qualified him for the unit, which is occupied exclusively by white males.   However, Officer Hanks, a previous recipient of a Mayor's Achievement Award for his work with youth, was denied the position.

87.     In his complaint, Officer Hanks alleges that one of BUCKNER's methods of retaliation was to wage a proxy campaign of personal and professional attacks against him, one

carried out by several high-ranking officers loyal to BUCKNER.  Officer Hanks alleges that BUCKNER and his minions have damaged his personal and professional reputation by smearing him with false information in the eyes of department leaders.

88.     To prove a 42 U.S.C. § 1983 conspiracy claim, a plaintiff must show: (1) that the defendant conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff.

89.     BUCKNER, JOHN DOES 1-2 and CALHOUN conspired amongst themselves and others to deprive PLAINTIFFS of their constitutional rights.  BUCKNER, JOHN DOES 1-2 and CALHOUN engaged in multiple overt acts in furtherance of the conspiracy alleged herein and these overt acts caused injury to PLAINTIFFS, including but not limited to:

> a) conspired to execute a "no-knock" raid based upon knowingly false information at the location of 601 Valmar Street simply because the resident, PORTER, was African American;
>
> b) authorized the "no-knock" raid of 601 Valmar Street simply because the resident, PORTER, was African American;
>
> c) conspired to execute "no-knock" raids upon residences and dwellings believed to be occupied by African Americans, such as PORTER, for the purpose of terrorizing and marginalizing them within society; and
>
> d) conspired to conceal fact that the "no-knock" raid of 601 Valmar Street was illegal insofar as it was authorized by an order which was obtained by deceit and, therefore, neither JOHN DOES 1-2 nor any other CITY employee had a legal basis to search the dwelling.

90.     By reason of the conduct of BUCKNER, JOHN DOES 1-2 and CALHOUN, and each of them, PLAINTIFFS were deprived of rights, privileges and immunities secured to them

by the Fourth and Fourteenth Amendments to the United States Constitution, and laws enacted thereunder.

91.     The acts committed by BUCKNER, JOHN DOES 1-2 and CALHOUN, and each of them, PLAINTIFFS were unnecessary, objectively unreasonable and excessive and were, therefore, in violation of PLAINTIFFS' Fourth and Fourteenth Amendment Rights.  Therefore, BUCKNER, JOHN DOES 1-2 and CALHOUN, and each of them, are liable to PLAINTIFFS in damages under 42 U.S.C. § 1983, including loss of liberty interest, punitive damages and attorney fees.

WHEREFORE, PLAINTIFFS pray for judgment against BUCKNER, JOHN DOES 1-2 and CALHOUN, in an amount which will fully and fairly compensate PLAINTIFFS for the damages suffered and asserted herein.

**COUNT V**
**JOHN DOES 1-2 AND TIMOTHY CALHOUN**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS–STATE LAW**

92.     PLAINTIFFS hereby incorporates and re-alleges Paragraphs one (1) through ninety-one (91) above as and for Paragraph ninety-two (92) of Count V.

93.     JOHN DOES 1-2 and CALHOUN engaged in intentional and reckless conduct, which was equally extreme and outrageous.

94.     That there is a causal connection between the wrongful and fraudulent conduct committed by JOHN DOES 1-2 and CALHOUN and the emotional distress suffered by PLAINTIFFS.  PLAINTIFFS' emotional distress consists of flashbacks, anxiety and/or other manifestations and is severe.

WHEREFORE, PLAINTIFFS pray for judgment against JOHN DOES 1-2 and CALHOUN, in an amount which will fully and fairly compensate PLAINTIFFS for the damages suffered and asserted herein.

**COUNT VI**
**KENTON BUCKNER**
**SINGLE ACT SUPERVISORY LIABILITY**

95.    PLAINTIFFS hereby incorporate and re-allege Paragraphs one (1) through ninety-four (94) above as and for Paragraph ninety-five (95) of Count VI.

96.    At all relevant times, BUCKNER knew that "no-knock" warrants were reserved for "high-risk situations," and that it is unconstitutional and unlawful to knowingly submit affidavits which contain material misrepresentations of fact or are otherwise untruthful to judges or magistrates in order to obtain "no-knock" warrants.  At all relevant times, BUCKNER knew the inherently dangerous nature of SWAT entries.

97.    Nonetheless, BUCKNER, the CITY's final policymaker, consciously disregarded this known risk by:

    a)  promulgating official policy and/or custom in conflict with United States Constitution;

    b)  Failing to abolish official policy and/or custom in conflict with United States Constitution;

    c)  Permitting informal custom for SWAT in conflict with United States Constitution and LRPD policies; and

    d)  Allowing officers with a demonstrable history of materially misrepresenting facts in sworn affidavits to obtain "no-knock" warrants to continue to execute sworn affidavits with materially misrepresented facts to obtain search warrants.

98.    That there is a direct link between the official policy and/or custom promulgated or continued by BUCKNER and the constitutional injuries sustained by PLAINTIFFS.

99.    The acts and omissions of the BUCKNER described above were the moving force behind the violations of PLAINTIFFS' constitutional rights and proximately caused PLAINTIFFS' constitutional injuries. The official policy and/or custom described above also proximately caused a deprivation of the rights, privileges and immunities secured to PLAINTIFFS by the Fourth and Fourteenth Amendments to the U.S. Constitution, and laws enacted thereunder.

100.    As a result of the official policies and/or customs described above, PLAINTIFFS' Fourth Amendment rights were violated. Therefore, BUCKNER is liable to PLAINTIFFS in damages under 42 U.S.C. § 1983, including, loss of liberty interest, punitive damages and attorney fees.

WHEREFORE, Plaintiffs, WILLIAM PORTER, Individually, MARANDA STIVERS, Individually, and as Next Friend of GATLIN OUTLAW, a Minor, by and through their attorneys, LAUX LAW GROUP and BEN CRUMP, PLLC, and request judgment against the Defendants, and each of them:

1.   That Defendants be required to pay PLAINTIFFS' compensatory damages;

2.   That Defendants be required to pay actual damages;

3.   That BUCKNER, JOHN DOES 1-2 and CALHOUN be required to pay punitive damages;

4.   That Defendants be required to pay attorney fees per 42 U.S.C. § 1988;

5.   That this Honorable Court provide appropriate injunctive relief;

6.   That this Honorable Court declare that the LRPD's official policies and/or customs described herein are unconstitutional; and

7.   That PLAINTIFFS have any other such relief as this Honorable Court deems just and proper.

24

Respectfully submitted,

Michael J. Laux
Michael J. Laux
E. Dist. Arkansas Bar No. 6278834
One of the Attorneys for PLAINTIFFS
LAUX LAW GROUP
400 W. Capitol Avenue, Suite 1700
Little Rock, AR 72201
Telephone: (501) 242-0750
Facsimile: (501) 372-3482
E-mail: mlaux@lauxlawgroup.com
         mikelaux@icloud.com

and

Benjamin L. Crump
E. Dist. Arkansas Bar No. 0072583
One of the Attorneys for PLAINTIFFS
BEN CRUMP, PLLC
122 S. Calhoun Street
Tallahassee, FL 32201
Telephone: (850) 224-2020
Email: ben@bencrump.com